IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ELAINE L. CHAO, Secretary of Labor, United States Department of Labor, | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 3:03-CV-2666-L |
| LOCAL 556, TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

**I. Background**

Plaintiff Eliane L Chao ("Plaintiff" or "the Secretary") filed this action against Defendant Local 556, Transport Workers Union of America, AFL-CIO ("Defendant" or "Local 556") on October 31, 2003, pursuant to Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. §§ 481-483, hereinafter referred to as "LMRDA"). Plaintiff contends that (1) Local 556 violated Section 401(e) of the Act (29 U.S.C. § 481(e) (2005)) when it failed to distribute campaign literature to its members at the Oakland base until March 3, 2003, in violation of its bylaws; and (2) the violation may have affected the outcome of the Local 556's March 14, 2003 general election ("election") for the office of First-Vice President. Specifically, Plaintiff argues that Local 556's bylaws require campaign literature to be distributed to all members before the beginning of a general election, meaning before the first ballot is cast. It contends that Local 556 violated its bylaws, as well as Title IV, by distributing such literature at the Oakland base after the election began. Because of this untimely distribution, Plaintiff contends that the Oakland members did not

have an opportunity to review the literature before voting, which may have affected the outcome of the election. Plaintiff requests the court to set aside the election for First-Vice President and to direct a new election to be conducted under the supervision of the Secretary. Plaintiff also seeks to recover the cost of this action.

Defendant contends that the delayed distribution of campaign literature did not violate Section 401(e), as (1) the campaign literature was distributed "prior to the general election," pursuant to its bylaws; and (2) there was no harm in the election outcome caused by the delayed distribution of campaign literature. It characterizes the delayed distribution as a "no harm, no foul" situation and contends that such delay did not affect the Oakland members' voting, since the Oakland members were sufficiently informed about the candidates before receiving the campaign literature.

On January 14, 2005, the court denied Defendant's Motion for Summary Judgment. The court then conducted a one-day bench trial on February 16, 2005. The next day, on February 17, 2005, the court directed the parties to address two specific inquiries: "when the general election began," and the meaning or interpretation of "prior to the general election." The parties filed their Proposed Findings of Fact and Conclusions of Law on April 22, 2005.

This case turns on the decision of two questions: (1) did Local 556 violate 29 U.S.C. § 481(e) by failing to distribute campaign literature to its members at the Oakland base until March 3, 2003; and (2) if so, may the violation have affected the outcome of Local 556's election for the office of First-Vice President? By this Memorandum Opinion and Order, the court makes the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a).

## II. Findings of Fact[1]

Local 556 of the Transportation Workers Union of America, AFL-CIO is a labor organization representing all Southwest Airlines flight attendants. Southwest maintains "bases" for flight attendants to begin and end their flight schedule. As of March, 2003, Southwest maintained seven flight attendant bases, including a base in Oakland, California.

Local 556, purporting to act pursuant to its bylaws and the Constitution of the Transportation Workers Union of America, AFL-CIO ("TWU"), conducted the election, which was subject to the LMRDA. On December 4, 2002, Local 556 informed its members that it would conduct the election on March 14, 2003. It further informed its members that nominations of candidates for the election would be taken at its January 2003 membership meeting. Melissa Smith, a Local 556 member in good standing, was nominated at the January 2003 meeting to run as a candidate for the office of First-Vice President. Smith, as an election candidate, became eligible for Local 556 to distribute campaign literature in aid of her candidacy to all Local 556 members in good standing, pursuant to 29 U.S.C. § 481(c) and (e) as well as Local 556's bylaws. Article IX, paragraph (o) of Local 556's bylaws provides:

> The union will print and distribute one (8½ x 11 inch) page of campaign literature for each candidate prior to the general election. Each candidate will be responsible to provide their own page, ready for print, fourteen (14) days after

---

[1]The facts contained herein are either undisputed or the court has made the finding based on the credibility or believability of each witness. In doing so, the court considered all of the circumstances under which the witness testified, which include: the relationship of the witness to Plaintiff or Defendant; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail.

> nomination at the end of membership meetings. Such page may include printed copy, photographs and/or artwork.[2]

*See* Def.'s Trial Ex. 1. Smith provided Local 556 with the information for her one-page piece of campaign literature pursuant to the bylaw. Thereafter, Local 556 retained a printing firm, and the firm produced booklets containing the one-page piece of campaign literature for all candidates choosing to participate in Local 556's literature distribution. Such campaign booklets allowed all candidates who wished to participate an equal opportunity to provide information; it was also the only campaign material guaranteed as an available information resource for every Local 556 member. Local 556 was responsible for distributing these booklets to all bases, including the Oakland base, according to its bylaws and the TWU Constitution.

The election was conducted via mail-in ballot. The election voting period, meaning the time frame for receipt of mail-in ballots, began February 18, 2003 and ended March 13, 2003. According to the election voting instructions, "Ballots received after 3:00PM, March 13, 2003 will **NOT** be counted."[3] Pl.'s Trial Ex. 10 (emphasis in original). Local 556 retained Automated Election Services, Ink Impressions, Inc. ("AES") to administer the election. Pursuant to an agreement between Local 556 and AES, AES prepared individual ballot packets for mailing. Each packet included a ballot, a voting instructions form, a secrecy envelope, and a return mailing envelope. On February 18, 2005, AES mailed one packet to the home address of all Local 556 members. A total of 1,101 ballot packets were mailed to members of the Oakland base.

---

[2]This bylaw was added in 1999 and first used in the 2000 election of Local 556 Officers and Board members. The bylaw has therefore been in effect for two elections. There is no calendar date for distribution stated in the bylaw. Likewise, the bylaw does not specify a particular distribution method.

[3]The Official Election Ballot Envelope listed a return address in Rio Rancho, New Mexico. *See* Pl.'s Trial Ex. 10.

On February 14, 2003, the campaign booklets were delivered to Local 556 at its Dallas office. Local 556 believed the distribution of the booklets was not time-sensitive. Accordingly, it used volunteer labor and free company air transit to move the campaign material from Dallas to the flight attendant bases in the Southwest system, a process which has no tracking ability and an uncertain time of delivery. On February 15, 2003, Will Browne, a flight attendant and Oakland base representative, posted a request for help on the TWU-Precinct Captain website, stating that he needed volunteers to place the booklets in Oakland flight attendant mailboxes. He stated that the Oakland base would probably receive the campaign booklets on "Tuesday or Wednesday, the 18 or 19th," and that he could not stuff the mailboxes because he would "be out of town for the next two weeks, and not able to complete IMPORTANT task." Pl.'s Trial Ex. 2 (emphasis in original). Later that night, Browne sent an e-mail to Sonia Hall, Chairperson of Local 556's Board of Election, stating, "If it's there early Monday, I'll try to handle it myself. Otherwise, I'm off to Hawaii for vacation. I put it on the [Precinct Captain] board, asking for help." Pl.'s Trial Ex. 3.

On February 16, 2003, the booklets were shipped to the seven Local 556 bases, including the Oakland base. By this date, the candidates, including Smith, Deborah Danish ("Danish"), and incumbent Michael Massoni ("Massoni"), had been campaigning for several weeks. The Oakland base did not receive the booklets on Monday, February 17, 2003, and Browne left on vacation. When Browne returned on March 3, 2003, he discovered that the boxes containing the campaign booklets were unopened. The booklets were subsequently placed in the Oakland flight attendant mailboxes on March 3rd or 4th, 2003. Accordingly, the campaign booklets were not distributed to Local 556's Oakland members until after ballots could be accepted by mail, and at least not until10 days before the ballot receipt deadline.

On March 14, 2003, the returned accepted ballots were counted and certified as final. The final balloting in the First-Vice President race resulted in incumbent Massoni winning by less than 50 votes over Danish and by 72 votes over Smith. AES received 380 returned accepted ballots from Local 556 Oakland flight attendants during the voting period. It received 219 of these ballots from February 18 through March 3, 2003, and a total of 227 through March 4, 2003. Accordingly, AES had received between 219 and 227 of the total 380 returned accepted ballots by Oakland flight attendants before the campaign booklets were distributed at the Oakland base.

The evidence is silent as to whether any Local 556 Oakland flight attendant consulted the campaign booklet before voting, or conversely, relied heavily upon it in choosing a candidate. Moreover, all three First-Vice President candidates campaigned independently of the campaign booklet, and each campaigned at least once at the Oakland base by personally appearing and distributing similar campaign literature prior to the distribution of the campaign booklets. Additionally, neither AES, through its voter call-in operation, nor the Board of Election received a complaint from any Local 556 Oakland flight attendant regarding the untimely distribution of campaign booklets.

Smith protested the election to the Local Executive Board on March 25, 2003. The Board denied the protest on April 16, 2003. She then appealed the Board's decision to the TWU on April 24, 2003. Having invoked the available remedies without obtaining a final decision within three calendar months after invocation, Smith filed a timely complaint pursuant to 29 U.S.C. § 482(a)(2) with the Secretary of Labor on July 14, 2003.

## III. Conclusions of Law[4]

[4]To the extent any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

**A. Local 556's Delayed Distribution**

Title IV's special function in furthering the overall goals of the LMRDA is to ensure free and democratic elections. *Wirtz v. Local 153, Glass Bottle Blowers Ass'n.*, 389 U.S. 463, 468 (1968).

Congress intended to "protect the rights of rank-and-file members to participate fully in the operation of their union through the process of democratic self-government, and, through the election process, to keep union leadership responsive to the membership." *Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 497 (1968). Its specific provisions exist to, among other things, "insure equality of treatment in the mailing of campaign literature" and "require adequate safeguards to insure a fair election." *Local 153*, 389 U.S. at 472 (citing 29 U.S.C. §§ 481(c), (e)). Thus, Title IV was not designed merely to protect the right of a union member to run for a particular office in a particular election, but to advance a vital public interest in assuring free and democratic union elections. *Local 3489, United States Steel Workers of Am., AFL-CIO v. Usery*, 429 U.S. 305, 309 (1977) (citing *Local 153*, 389 U.S. at 475)). Congress chose to do so by regulating the election procedure itself. *Id.* at 311-12.

An election of union officers shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with Title IV provisions. 29 U.S.C. § 481(e). Accordingly, the freedom for unions to run their own elections is reserved for those elections which conform to the democratic principles written into § 401, 29 U.S.C. § 481. *Local 153*, 389 U.S. at 471. Courts should defer to a union's interpretation of its own bylaw or constitution so long as its interpretation is consistent and reasonable. 29 C.F.R. §§ 452.2-.3, .109.[5]

[5]29 C.F.R. § 452 sets forth a "practical guide" as to how the Secretary of Labor will seek to apply the LMRDA. The correctness of an interpretation can be determined finally and authoritatively only by the

A union's discretion regarding the conduct of elections is thus circumscribed by a general rule of fairness. 29 C.F.R. § 452.110 (2005).

Labor organizations must also comply with all reasonable requests of any candidate to distribute mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization. 29 U.S.C. § 481(c).[6] In order to clarify the duty of the union, the Department of Labor promulgated the following interpretative regulation:

> In a mail ballot election a union's delay in the distribution of campaign literature until after the ballots have been distributed and some have been cast would not satisfy the requirement to distribute such literature in compliance with a reasonable request. Such a delay would deny the candidate a reasonable opportunity to campaign prior to the election and would thus not meet the requirement for adequate safeguards to insure a fair election.

29 C.F.R. § 452.79 (2005) (citing *Wirtz v. Am. Guild of Variety Artists*, 267 F. Supp. 527 (S.D.N.Y. 1967). A suit by the Secretary pursuant to 29 U.S.C. § 482 exists as a safeguard to ensure a fair election shall be provided. 29 U.S.C. § 482(b) (2005); 29 C.F.R. § 452.83 (2005).

The court finds that Local 556 failed to distribute the campaign booklets prior to the general election. As a result, Local 556 violated 29 U.S.C. § 481(e) when it failed to distribute the campaign booklets to Oakland flight attendants until March 3, 2003, in violation of Article IX, paragraph (o) of its bylaws. Local 556 contends that it did not violate its own bylaws despite the delayed distribution of the campaign booklets. It interprets the language "prior to the general election" contained in the bylaw to mean "before the general election is over," and has maintained this view

---

courts. *See* 29 C.F.R. § 452.1 (2005).

[6]There is no requirement that the union distribute candidate campaign literature free of charge. 29 C.F.R. § 452.69 (2005). Accordingly, Local 556, pursuant to Article IX, paragraph (o), exceeds the statutory minimum by printing and distributing the campaign literature free of charge. *See* Def.'s Trial Ex. 1.

in both the 2000 and 2003 general elections. Local 556's strict reading essentially would allow the union to comply with the bylaw so long as campaign booklets were distributed to the Oakland flight attendants before the ballot receipt deadline on March 13, 2003 at 3:00pm.

The court has measured Local 556's interpretation of its bylaw in terms of its consistency with Title IV's command that unions conduct free and democratic elections, and determines its interpretation to be unreasonable. *See Local 6*, 391 U.S. at 499. Campaign booklets were not placed in Local 556 Oakland flight attendant mailboxes until nearly two weeks after ballots were distributed and voting began. Accordingly, the delayed distribution infringed Smith's reasonable opportunity to campaign, thereby denying an adequate safeguard to ensure a fair election. *See* 29 C.F.R. § 452.79. More importantly, the delayed distribution restricted free choice among candidates and impeded the ability of Local 556 members to participate fully in the operation of their union through the election process. *See Usery*, 429 U.S. at 312; *see Local 6*, 391 U.S. at 497.[7] For these reasons, the delay conflicted with the vital public interest in assuring free and democratic union elections. *See Usery*, 429 U.S. at 309.

**B. Effect of Local 556's Violation on the Outcome of the Election**

If, upon a preponderance of the evidence after a trial on the merits, the court finds that the violation of 29 U.S.C. § 481 may have affected the outcome of an election, the court shall declare the election to be void and direct the conduct of a new election under supervision of the Secretary. 29 U.S.C. § 482(c)(2) (2005).[8] So far as practicable, such new election shall be conducted in

---

[7]The opportunity for members to have a free, fair, and informed expression of their choices among candidates seeking union office is a prime objective of Title IV. 29 C.F.R. § 452.66 (2005).

[8]In such circumstance, "the only assurance that the new officers do in fact hold office by reason of a truly fair and democratic vote is to do what the Act requires, rerun the election under the Secretary's supervision." *Local 153*, 389 U.S. at 475.

conformity with the constitution and bylaws of the labor organization. *Id*. A violation of 29 U.S.C. § 481 has the effect of establishing a prima facie case that the violation "may have affected the outcome." *Local 6*, 391 U.S. at 506-507. The effect may be met by evidence which supports a finding that the violation did not affect the result. *Id*.; *Donovan v. Local 10902, Commc'n Workers of Am., AFL-CIO*, 650 F.2d 799, 802 (5th Cir. 1981); *Marshall v. Plumbers & Steamfitters Local 654, United Ass'n of Journeymen & Apprentices of the Plumbing Indus. of the United States & Canada, AFL-CIO*, No. CA 1-76-30, 1978 WL 1729, at *2 (N.D. Tex. June 7, 1978).

The court is satisfied that a preponderance of the evidence clearly shows that Local 556's violation of 28 U.S.C. § 481 may have affected the outcome of the election and that the prima facie case thus established has not been rebutted by the evidence of record. The Secretary applies the theory of "maximum theoretical possibility" to contend that the violation affected the outcome of the election. *E.g.*, *Marshall v. Am. Postal Workers Union, AFL-CIO*, 486 F. Supp. 79, 82 (D.D.C. 1980). Accordingly, the Secretary argues that because the final margin of error was 72 votes, Local 556's delayed distribution "may have affected" the election's outcome, since any number of the 219 to 227 Oakland flight attendants who voted before distribution of the campaign booklets may have voted differently had they been timely provided with the campaign literature. The court agrees.

More importantly, and separate from the theory of maximum theoretical possibility, the court finds it significant that 219 to 227 Local 556 Oakland flight attendants voted before the campaign booklets were distributed, as these members voted without the benefit of campaign information promised by their union. Indeed, "any proof relating to effect on outcome must necessarily be speculative . . . ." *Local 6*, 391 U.S. at 507. The court concludes that the 227 ballots cast before

distribution is "well in excess of the margin deciding" the election, and therefore enough to show that the violation may have affected the outcome. *See Local 10902*, 650 F.2d at 802.

The court has considered Local 556's argument that the delay could not have affected the outcome of the election because the three First-Vice Presidential candidates campaigned independently of the campaign booklet, each campaigning at least once at the Oakland base by personally appearing and distributing similar campaign literature prior to the distribution of the campaign booklets. Likewise, Local 556 contends that the delay was at most a "no harm, no foul" situation, as neither AES nor the Board of Election received a complaint from any Local 556 Oakland flight attendant regarding the untimely distribution of campaign booklets. In union elections, as in political elections, it is fair to assume that "more, rather than less, freedom in the exchange of views will contribute to the democratic process." *Int'l Org. of Masters, Mates, & Pilots v. Brown*, 498 U.S. 466, 477 (1991). The campaign booklets were "more information." *Id*. Such booklets may or may not have been the most effective campaign tool, and perhaps were not read; but they were the only document guaranteed by the union to be made available to all Local 556 members. Because Local 556 failed to timely distribute such resource, the failure may or could have affected the election outcome.

**IV. <u>Conclusion</u>**

For the reasons stated herein, the court finds that the Secretary has proved by a preponderance of the evidence that Local 556 violated 29 U.S.C. § 481(e) when it failed to distribute the campaign booklets to the Oakland flight attendants until March 3, 2003, in violation of its bylaws. Accordingly, the court **declares** that Local 556's March 14, 2003 election for the office of First-Vice President **is null and void**. The court **directs and orders** Local 556 to conduct a new

election for the office of First-Vice President within ninety (90) days of the date of this Memorandum Opinion and Order under the supervision and direction of the Secretary pursuant to 29 U.S.C. § 482(c). Said election, so far as lawful and practicable, shall be conducted in conformity with Local 556's bylaws and TWU's Constitution. To ensure that union members are aware why a new election was ordered and is being conducted, Local 556 **shall** distribute to each of its members in good standing by mail or by placement in base mailboxes a complete copy, without editorial or extraneous comment, of the court's Memorandum Opinion and Order, issued September 30, 2005, within thirty (30) days of entry. Local 556 **shall** notify the court in writing that such distribution has been completed. The court will retain jurisdiction of this action until such time as the new election is conducted and the results are certified to the court by the Secretary, at which time final judgment will be entered disposing of this matter. The court will issue judgment by separate document pursuant to Fed. R. Civ. P. 58 at the appropriate time.[9]

**It is so ordered** this 30th day of September, 2005.

Sam A. Lindsay
United States District Judge

---

[9]Plaintiff has requested that Local 556 be ordered to pay the costs of suit. The court will include a provision in its judgment that Local 556 pay all allowable and reasonable costs of suit.